## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

KEITH CREWS,

Defendant.

Civil Action No.:

1:23-cv-03658-TRJ

## MEMO OF LAW IN SUPPORT OF MOTION FOR REMEDIES AND FINAL JUDGMENT AGAINST DEFENDANT KEITH CREWS

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") hereby submits this memo of law in support of its motion for remedies and final judgment against Defendant Keith Crews ("Defendant" or "Crews") seeking injunctive relief, an officer and director bar, disgorgement of $530,000 and prejudgment interest of $50,930.75 thereon, and a civil penalty of $530,000, and states in support thereof as follows:

## I.       BACKGROUND

This matter involves an affinity offering fraud perpetrated by Defendant

Crews, a resident of Kennesaw, Georgia, through two entities he owned and controlled, Four (4) Square Biz LLC ("4 Square Biz") and Stem Biotech LLC ("Stem Biotech"). *See* Dkt. 1, ¶ 1. Specifically, between at least October 2019 and May 2021, Crews raised at least $800,000 from approximately 200 investors—many of whom were solicited through relationships in African-American and church communities—through the sale of a purported crypto asset security named "Stemy Coin." *Id.*, ¶ 2.

In connection with the offer and sale of Stemy Coin, Crews and his entities made numerous material misstatements and omissions to investors, including that Stemy Coin was backed by stem cell technology and other assets, that Stem Biotech had existing operations and stem cell products, that Stem Biotech had existing partnerships with entities involved in the stem cell industry—with one of those entity's owners serving as the Chief Executive Officer of Stem Biotech—and that the investment in Stemy Coin would provide substantial dividend returns and "legacy wealth" for its investors. *Id.*, ¶ 3. In fact, Crews and his entities had no existing stem cell technology, products, or operations, there was no partnership with the claimed entities—much less service as CEO by one of those entity's leaders—and any returns on their Stemy Coin investment were highly speculative at best. *Id.*, ¶ 4. As set forth in further detail below, investors have lost at least approximately $530,000 fraudulently procured by Crews.

On August 17, 2023, the Commission filed an action against Crews in the U.S. District Court for the Northern District of Georgia. *See* Dkt. 1. Following extensive efforts to locate and serve Crews, the SEC was able to serve Crews personally with the Summons and Complaint on February 15, 2024. *See* Dkt. 6. Following a joint motion seeking an extension of Crews's time to answer and/or respond to the Complaint, the Court extended Crews's time to respond until April 22, 2024. *See* Dkt. 7. A copy of that information was sent to Crews by email on April 1, 2024 by SEC counsel. *See* Declaration of Nana Jorjoladze, Ex. A.

Notwithstanding that Court order, Crews has not filed an Answer or other response with the Clerk of this Court, nor served a copy of the Answer or other response upon the SEC. To date, Crews has not responded to the Complaint, nor otherwise opposed this action. On July 1, 2024, the SEC moved for entry of default by the Clerk pursuant to Federal Rule of Civil Procedure 55(a), *see* Dkt. 8, which default was entered by the Clerk on July 2, 2024.

## II.    FACTUAL ALLEGATIONS ACCEPTED AS TRUE

Federal Rule of Civil Procedure 55(b)(1) and (2) provide that, except in circumstances involving a plaintiff's claim for a "sum certain or a sum that can be made certain with computation", the party "must apply to the court for a default judgment." Given the various remedies being sought by the SEC do not involve a "sum certain,' the SEC is submitting this memorandum of law in support of its

motion for a remedies and final judgment pursuant to Rule 55(b)(2).

Where a defendant such as Crews is in default, the factual allegations of the Complaint, except those relating to damages, are accepted as true. *See* 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 2688, p. 412 (2d ed. 1983); *Thomson v. Wooster*, 114 U.S. 104 (1885).

### A.    Defendant Crews Fraudulently Solicited Investors Funds.

As set forth in the Complaint, Defendant Crews was a resident of Kennesaw, Georgia and was the Chairman of and controlled two entities Stem Biotech LLC ("Stem Biotech") and Four (4) Square Biz LLC ("4 Square Biz"), both with their principal place of business in Kennesaw, Georgia. *See* Dkt. 1, ¶¶ 6-8. Crews formed 4 Square Biz in or about July 2018. *Id.*, ¶ 13. According to its website, 4 Square Biz planned to develop online banking systems and exchanges using blockchain technology. *Id.*, ¶ 13. In or about May 2019, Crews formed Stem Biotech as a subsidiary of 4 Square Biz. *Id*.

Stem Biotech's purported "goal [was] to deploy worldwide advanced rejuvenation centers utilizing the latest and greatest stem cell technology to reverse aging and illness plaguing human beings on planet earth." *Id.*, ¶ 14. Since the start of the pandemic in early 2020, Stem Biotech also represented that its stem cell treatments aid in the fight against Covid-19. *Id.*

In or about May 2019, Crews, through 4 Square Biz and Stem Biotech, supposedly launched a crypto wallet to sell "Stemy Coin," a purported crypto asset allegedly backed by Stem Biotech's stem cell technology and hard assets such as gold. *Id.*, ¶ 15.

From at least October 2019 to May 2021, Crews offered and sold Stemy Coin to investors (often through email or telephone) through specific and general solicitations, including information on 4 Square Biz's and Stem Biotech's websites, and a network of "ambassadors" who solicited investors using materials and information Crews created or reviewed and approved. *Id.*, ¶ 16. Crews used his connections in the African-American community to solicit investors—many of whom were non-accredited—and also recruited investors through relationships at church and a Bible study. *Id.*

Through these solicitations, 4 Square Biz's and Stem Biotech's websites and other offering materials provided to investors and prospective investors, Crews offered and sold Stemy Coin claiming, among other things, that:

- Stem Biotech had existing assets, operations, and products and a successful history and track record, including their own labs and stem cell products, a "legacy of delivering transformational treatments," "dozens of other FDA studies," and their "own research, as well as partnerships with universities, medical research institutions and other global pharmaceutical leaders, [through which] Stem Biotech is bringing forward scientific and clinical advancements that prevent, treat or cure life-threatening diseases";

- Stemy Coin "is backed by both stem cell technology and hard assets such as gold";

- Stem Biotech had a partnership with Alexandros LLC ("Alexandros") – an entity owned by Dr. Nayan Shah – and Dr. Shah was serving as Chief Executive Officer of Stem Biotech, overseeing "the company's research and preclinical programs," and "leading efforts to advance multiple products from early-stage research into clinical development";

- Stem Biotech had a partnership with BHI Therapeutic Sciences ("BHI"), an entity engaged in stem cell research and treatment;

- Crews was a successful businessman with experience in marketing, telecommunications, renewable energy, and oil and gas who had founded and/or served as the president and CEO of multiple, successful companies; and

- Investors would receive substantial returns on their investment through dividends and great increases in the value of Stemy Coin.

*Id.*, ¶ 17.

Through these and other misstatements and omissions, Crews lured as many as 200 investors to invest at least $800,000 in Stemy Coin, several of whom invested their money through cash transfer apps and wire transfers. *Id.*, ¶ 18.

Contrary to Crews's statements to investors and prospective investors, Stem Biotech never had any labs, delivered any treatments, conducted any stem cell

6

research, developed or sold any stem cell products, had existing stem cell business operations or any legacy or track record in that area. *Id.*, ¶ 19. In short, none of Stem Biotech, 4 Square Biz or Crews owned stem cell technology other assets to provide security to the investors of Stemy Coin. *Id.*

Additionally, neither Stem Biotech nor 4 Square Biz had any partnership with Alexandros, and Dr. Shah never served as an officer of Stem Biotech. *Id.*, ¶ 20. In May 2020, Dr. Shah specifically asked Crews to stop using his and Alexandros's name in connection with Crews's businesses. *Id.*

Similarly, none of Stem Biotech, 4 Square Biz or Crews ever had any rights to BHI's intellectual property. *Id.*, ¶ 21. In January 2021, BHI sent a cease and desist letter to Crews, requesting that he stop using BHI's name, logo, products, or videos to solicit investors for Crews's entities. *Id.*

Contrary to his portrayal as a successful business person, undisclosed to investors, Crews had also personally filed for bankruptcy multiple times. *Id.*, ¶ 22.

And, far from being a reliable source of future income and substantial asset growth, any investment in Stemy Coin was highly speculative and uncertain at best. *Id.*, ¶ 23.

Stemy Coin cannot be traded, exchanged, or used to pay for services. Moreover, investors have not received any dividends or returns on their investments. *Id.*, ¶ 24.

When Crews appeared for subpoenaed testimony in connection with the SEC's investigation concerning Stemy Coin, he invoked his Fifth Amendment privilege against self-incrimination in response to all substantive questions. *See* Declaration of Erin East ("East Declaration", ¶ 2).

## B.    Defendant Crews Engaged in Offers and Sales of Stemy Coin Without Registration or Exemption of Those Securities.

Crews engaged in the offers or sales of Stemy Coin without filing a registration statement with the Commission or without any exemption from registration available. Dkt. 1, ¶ 25.  Crews offered and sold these securities via email and publicly available websites, accepting investors from multiple states. *Id.*, ¶ 26.  Many of the investors made their investments by electronically transferring their funds through cash transfer apps or wire transfers. *Id.*, ¶ 27. Many of the investors in Stemy Coin were not qualified as accredited investors. *Id.*, ¶ 28.

Crews did not take reasonable steps to verify that investors were accredited; he had little to no personal knowledge of most of the investors' financial circumstances and did not take steps to determine or verify their financial condition. *Id.*, ¶ 29.  While Crews subsequently sent out investor communications promising to return funds invested by unaccredited investors, no such investor funds have ever been returned. *Id.*, ¶ 30.

## III.  ARGUMENT

### A. Crews Violated Section 10(b) and Rule 10b-5 of the Securities Exchange Action of 1934 and Section 17(a)(1) and (a)(3) of the <u>Securities Act of 1933.</u>

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder prohibit any person from employing "any device, scheme, or artifice to defraud" or engaging in any "act, practice, or course of business" which operates or would operate as a fraud or deceit on any person, in connection with the purchase or sale of a security.  Similarly, Sections 17(a)(1) and (a)(3) of the Securities Act of 1933 ("Securities Act") prohibit any person from, in the offer or sale of a security, employing "any device, scheme, or artifice to defraud" or engaging in any "transaction, practice, or course of business" which operates or would operate as a fraud or deceit on any purchaser.  Proof of scienter is required for Rules 10b-5(a) and (c) and Section 17(a)(1), whereas negligence is sufficient for Section 17(a)(3).  *Aaron v. SEC*, 446 U.S. 680, 691, 697 (1980).

The language of these provisions is "expansive," and they "capture a wide range of conduct."  *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019).  In *Lorenzo*, the Supreme Court held that knowingly disseminating a false statement to investors with the intent to deceive can violate Rules 10b-5(a) and (c) and Section 17(a)(1).  *Id.*; *see also Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019) (applying *Lorenzo* to Section 17(a)(3) because it "is virtually identical to Rule 10b-5(c)").

The Court rejected Lorenzo's arguments that each subsection of Rule 10b-5 "should be read as governing different, mutually exclusive, spheres of conduct" and that all conduct relating to false statements must be charged under Rule 10b-5(b) (or, by extension, Section 17(a)(2)).  *Id*. at 1102-03.  Rather, the Court emphasized, there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and thus, the same underlying conduct may establish a violation of more than one subsection.  *Id*. at 1102 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983) (stating that, "it is hardly a novel proposition that" different portions of the securities laws "prohibit some of the same conduct")).

Here, Crews made repeated misrepresentations and omissions to Stemy Coin investors about Stem Biotech's management and partnership, its assets and operations, and the risks and returns associated with investing in Stemy Coin.  As set forth in the Complaint, Crews indicated that Stem Biotech had conducted stem cell research and treatments and possessed the resources and experience needed to open numerous stem cell treatment clinics across the world.  In reality, Stem Biotech had no actual business operations, had never conducted any stem cell research or treatments, and had no existing labs or treatment centers, no formal business partners, and no claim to any proprietary stem cell treatment technology. Further, although Crews promised investors exponential returns, Stemy Coin has

never been traded on a public stock exchange or crypto asset trading platform, and investors have never realized *any* returns on their investment, let alone the excessive returns promised by Crews.

Crews acted with scienter when making these misrepresentations to investors.  The Eleventh Circuit has concluded that scienter may be established by a showing of knowing misconduct or severe recklessness.  *See SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982).  "Proof of recklessness requires a showing that the defendant's conduct was an extreme departure of the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *SEC v. Monterosso*, 756 F.3d 1326, 1335 (11th Cir. 2014) (alterations adopted).

As Stem Biotech's founder and the person who controlled it, Crews knew or was reckless in not knowing that his representations regarding Stem Biotech's business assets and operations and the risks and returns associated with investing in Stemy Coin were false.  Therefore, Crews employed a "device, scheme, or artifice to defraud," in violation of Rule 10b-5(a) and Section 17(a)(1) and engaged in an "act" or "transaction, practice, or course of business" that "operated as a fraud or deceit" on investors under Rule 10b-5(c) and Section 17(a)(3).

### B.    Crews Violated Rule 10b-5(b) of the Exchange Act and Section 17(a)(2) of the Securities Act.

Section 10(b) of the Exchange Act and Rule 10b-5(b) prohibit any person in

connection with the purchase or sale of securities from making "any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  For purposes of Rule 10b-5(b), "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

Section 17(a)(2) of the Securities Act prohibits any person in the offer or sale of securities from "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  A fact is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision.  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  Proof of scienter is required for Rule 10b-5(b), whereas negligence is sufficient for Section 17(a)(2).  *Aaron*, 446 U.S. at 695 & 697.

Here, Crews made material misrepresentations and omissions to investors, through email and publicly available websites, regarding Stem Biotech's

management, business partners, assets, and operations.[1] *See, e.g.*, *SEC v. North American Research & Development Corp.*, 375 F. Supp. 465, 470-71 (S.D.N.Y 1974), *aff'd*, 511 F.2d 1217 (2d Cir. 1975), *cert. denied sub nom.*; *White v. SEC*, 423 U.S. 830 (1975) (discussing materially false and misleading statements regarding business operations and financial resources, among other things); *SEC v. Reynolds*, No. 1:06-CV-1801-RWS, 8 (N.D. Ga. Oct. 5, 2010) (defendant made material representations and omissions regarding processes that "did not actually exist"). Further, Crews made material misrepresentations and omissions to investors concerning the risks and returns associated with investing in Stemy Coin. *See CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1329-30 (11th Cir. 2002) (citing with approval *CFTC v. Noble Wealth Data Information Services, Inc.*, 90 F. Supp. 2d 676, 686 (D. Md. 2000) (holding that representations about profit potential and risk "go to the heart of a customer's investment decision and are therefore material as a matter of law")); *SEC v. Phoenix Telecom*, 239 F. Supp. 2d 1292, 1298-99 (N.D. Ga. 2000) (holding misrepresentations about the safety of an investment are material).

Crews's misstatements were made in the offer and sale of securities, and he obtained money or property by means of the misstatements. Further, as explained

---

[1]    Even if some of the statements were forward-looking projections, they constituted misrepresentations because Crews lacked any reasonable basis to make such statements. *See SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766-67 (11th Cir. 2007).

above, Crews acted with scienter.

### C.    Crews Violated Sections 5(a) and (c) of the Securities Act.

The Stemy Coins offered and sold by Crews are securities because they constitute investment contracts.  Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract." *See* 15 U.S.C. §§ 77b, 78c.  An investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.  *See SEC v. Edwards*, 540 U.S. 389, 393 (2004); *SEC v. W.J. Howey Co*., 328 U.S. 293, 301 (1946); *see also SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 732 (11th Cir. 2005).  This test embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Howey*, 328 U.S. at 299.  Schemes and contracts involving crypto assets may be securities.  *See, e.g.*, *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 367 (S.D.N.Y. 2020) (finding substantial likelihood of success in proving unregistered crypto asset offering using SAFTs was an offering of securities); *United States v. Zaslavskiy*, No. 17-CR-647-RJD, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) (upholding indictment for alleged scheme involving purported crypto assets backed by real estate investments).

Stemy Coins are securities as they satisfy each of the *Howey* factors.  The

first *Howey* factor is satisfied because Stemy Coins were offered in exchange for the payment of money. The second factor—common enterprise—has been addressed by courts in terms of both horizontal commonality and vertical commonality. In the Eleventh Circuit, "broad" vertical commonality is accepted, under which a common enterprise exists when "investors are dependent upon the expertise or efforts of the investment promoter for their returns." *ETS Payphones, Inc.*, 408 F.3d at 732. Here, broad vertical commonality exists because the investors' fortunes were dependent upon the efforts of Crews and Stem Biotech's purported stem cell treatment business to produce a return on their investment through dividends and an increased value from the growth of Stem Biotech.

The final *Howey* factors are satisfied because Crews created a reasonable expectation that Stemy Coin investors, who were entirely passive and had no control over how their investment proceeds were used, would earn profits in the form of dividends and increases in the value of the Stemy Coin. Crews claimed that the Stemy Coin was backed by Stem Biotech's stem cell treatment technology, among other assets, and led investors to believe that the reasonable expectation of profits would be derived from Stem Biotech's business activities.

Sections 5(a) and 5(c) of the Securities Act make it unlawful for any person to offer or sell any security when no registration statement has been filed or is in effect. To state a claim under Section 5, the Commission must demonstrate that

the defendant: (1) directly or indirectly sold or offered to sell securities; (2) through the use of interstate transportation or communication or the mails; and (3) when no registration statement was in effect. *SEC v. Calvo*, 378 F.3d 1211, 1214 (11th Cir. 2004). Section 5 violations do not require proof of scienter. *Id.* at 1215. Once the Commission has established a *prima facie* Section 5 violation, the burden shifts to the defendant to show that an exemption or safe harbor from registration was available. *SEC v. Cavanagh*, 445 F.3d 105, 111-12 (2d Cir. 2006).

Here, Crews offered and sold Stemy Coins without filing a registration statement with the Commission. He advertised the offering via electronic mail and publicly available websites and accepted investors from multiple states, who made their investments by electronically transferring funds through cash transfer apps or wire transfers. Accordingly, Crews violated the securities registration laws.

## IV.    THE COURT SHOULD ORDER APPROPRIATE RELIEF AGAINST CREWS.

### A.    <u>Injunctive Relief</u>

Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act provide that the Commission may bring actions in federal court seeking a permanent injunction against persons violating the Securities Act and the Exchange Act, respectively. To obtain a permanent injunction against future violation of the securities laws, the Commission must demonstrate the following factors: that (1) the Commission has actually succeeded on the merits, (2)

irreparable harm will likely result in the absence of the injunction, (3) the balance of the equities tips in the Commission's favor, and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008); *see also Starbucks v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (noting that "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity," which, with regard to injunctive relief, includes using "the traditional four-part test" set forth in *Winter*).

Each of the four elements is met here. *First*, the Commission has shown that the defendant has violated the securities laws—and thus the Commission has actually succeeded on the merits of its claims—for the reasons set forth above.

*Second*, the likelihood of irreparable harm is demonstrated by the Commission's showing the likelihood of defendant's future violations. To obtain an injunction against further securities law violations the Commission must show a "likelihood of recurrence," *SEC v. Gentile*, 939 F.3d 549, 555-58 (3d Cir. 2019), and such "cognizable risk of future harm" satisfies the "irreparable harm requirement." *SEC v. Chappell*, 107 F.4th 114, 128-29 (3d Cir. 2024) (discussing *Gentile*).

District courts granting injunctions under the four-part test also have recognized that the government's showing of a likelihood of future violations

satisfies the irreparable harm requirement. *See, e.g., FTC v. Your Yellow Pages, Inc.*, No. 14-cv-22129, c, at *1 (S.D. Fla. July 1, 2014) ("There is good cause to believe that immediate and irreparable harm will result from continued violations by [defendant] of the FTC Act unless he is restrained and enjoined."); *FTC v. Silueta Distributors, Inc.*, No. 93-cv-4141, 1994 WL 387881, at *1-*2 (N.D. Cal. July 11, 1994) (finding the "substantial risk of irreparable harm to the public from defendants' continuing violations of law"). Even courts that previously concluded irreparable harm is unnecessary in government enforcement actions have alternatively held that demonstrating a likelihood of future violations is sufficient to satisfy the irreparable harm requirement. *See SEC v. Lake Havasu Ests.,* 340 F. Supp. 1318, 1324 (D. Minn. 1972); *see also United States v. Kahen*, No. CV 20-00474, 2020 WL 1697974, at *1 (E.D.N.Y. Jan. 28, 2020); *FTC v. Mortg. Relief Advocs. LLC*, No. 14-cv-5434, 2014 WL 12479399, at *1 (C.D. Cal. Aug. 22, 2014).

In determining whether there is a reasonable likelihood of future violations, district courts consider the following:

> the fact that the defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an 'isolated occurrence;' whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

*SEC v. Cavanagh,* 155 F.3d 129, 135 (2d Cir. 1998); *see also SEC v. Pros Int'l*

*Inc*., 994 F.2d 767, 769 (10th Cir. 1993).

Under the facts of this case, each of the considerations stated above shows that defendant is likely to violate the anti-fraud provisions of the securities laws in the future. It is undisputed that defendant is liable for the illegal conduct and that scienter was involved. Crews's complete failure to respond to the Complaint highlights his disregard and non-acceptance of responsibility. Further, far from an isolated incident, Crews's conduct was egregious, repeated and highly misleading. Additionally, even subsequent to this fraud, Crews created an entity in 2022, for which he filed a Form D, signifying his intent to seek to raise $40 million by offering securities. *See* East Declaration, ¶ 6, Ex. B. Finally, while not in the securities profession, given his represented position as the head of at least two companies, the relative ease of establishing new companies and his misuse of relationships, there is a substantial risk of future violations as well.

The remaining two *Winter* factors (balancing the equities and consideration of the public interest) are easily met here. The third factor, balancing the equities, favors the Commission because "investors need[ ] the protection of an injunction" notwithstanding the private interests of the defendant, especially in light of the likelihood of their future fraud violations. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972).

With regard to the fourth factor for an injunction, "[a]s a practical matter,

where the Commission demonstrates both actual success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *See Chappell*, 107 F.4th at 139 (quotation omitted). Here, Crews's extensive defrauding of multiple victims, the egregiousness of his misconduct, and his relationship in various communities makes the balance of equities and the public interest weigh in favor of enjoining defendant here.

**B.    The Court Should Enjoin Crews from Participating in Any <u>Offering of Securities.</u>**

Section 21(d)(5) of the Exchange Act permits a federal court to grant "any equitable relief that may be appropriate or necessary for the benefit of investors." The SEC further seeks an injunction that would permanently enjoin Crews from participating, directly or indirectly, in any offering of securities, including any crypto asset security, although such injunction shall not prevent Crews from purchasing or selling securities for his own personal account. Such a conduct-based injunction is appropriate here in light of the egregious nature of Crews's misconduct and his refusal to acknowledge this misconduct and his efforts even after this fraud to seek to raise an additional $40 million through securities offerings. *See* East Declaration, ¶ 6, Ex. B.

**C.    The Court Should Impose an Officer and Director Bar <u>Against Crews.</u>**

A district court may also impose an officer and director bar under Section

21(d)(2) of the Exchange Act and Section 20(e) of the Securities Act against any

person found to have violated Section 10(b) of the Exchange Act Section or 17(a)

of the Securities Act, respectively.  Courts consider the following non-exclusive

factors to determine whether to impose an officer or director bar:  (1) the

egregiousness of the defendant's conduct; (2) the isolated or recurrent nature of the

violations; (3) the degree of scienter; (4) the sincerity of the defendant's assurances

against future infractions; (5) the defendant's recognition that he acted wrongfully;

and (6) the likelihood that the defendant's occupation will present opportunities for

future violations.  *See SEC v. Bankosky*, 716 F.3d 45, 48 (2d Cir. 2013) (citing

*Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979)); *see also SEC v. Hall*, 759

F. App'x 877, 884-885 (11th Cir. 2019).

Here, Crews knowingly made repeated misrepresentations to investors,

including many unsophisticated investors, regarding Stem Biotech's prospects,

resources, and operations.  Crews has refused to acknowledge his wrongful

conduct.  Although Crews has not served as an officer or director of a public

company, because he claims to have decades of business experience, there is risk

he could seek a future role as an officer or director of a public company.

Accordingly, the Court should impose an officer and director bar against him.

### D.    The Court Should Order Disgorgement and Prejudgment Interest Against Crews.

Under Sections 21(d)(5) and 21(d)(7) of the Exchange Act, federal district

courts have authority to order disgorgement in Commission enforcement actions. In addition, courts have discretion to add prejudgment interest to a defendant's disgorgement amount to prevent the defendant from benefitting from the use of their ill-gotten gains interest free. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996).

The SEC respectfully seeks disgorgement of $530,000 and prejudgment interest of $50,930.75 from Crews. As set forth in the accompanying East Declaration, ¶¶ 3-4, this amount represents the estimated $800,000 Crews received from investors, less $270,000 of expenses. *Liu v. SEC*, 140 S. Ct. 1936, 1950 (2020) ("courts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)" of the Exchange Act.). The $270,000 of expenses consist of payments Crews made pursuant to an agreement to purchase a minority ownership interest in BHI Therapeutic Sciences, Inc. ("BHI"), an entity purportedly engaged in stem cell research and treatment. *See* East Declaration, ¶ 4. While Crews's companies never had any partnership with BHI or any rights to BHI's intellectual property, the $270,000 paid to BHI could be considered a legitimate expense because it appears to have been a legitimate investment in a company engaged in stem cell research and treatment. *Id.*

The Court should also order Crews to pay prejudgment interest on this amount. The purpose of prejudgment interest is "to divest those found liable under

the securities laws of any benefit accrued from the use of the ill-gotten gain." *SEC v. Yun,* 148 F. Supp.2d 1287, 1293 (M.D. Fla. 2001), *aff'd in part and vac'd on other grounds*, 327 F.3d 1263 (11th Cir. 2001). Courts routinely use the IRS underpayment rate when calculating prejudgment interest in SEC enforcement actions because "[t]hat rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *SEC v. Radius Capital Corp.*, 2015 WL 1781567, *7 (M.D. Fla. Apr. 20, 2015) (citations and quotations omitted).

Here, the prejudgment interest rate (based on the IRS underpayment rate) calculated from the approximate date of the filing of the Complaint to November 1, 2024 is $50,930.75. *See* East Declaration, ¶ 5, Ex. B. The SEC respectfully seeks this amount of prejudgment interest on the disgorgement amount.

### E. <u>The Court Should Impose a Civil Penalty of $530,000.</u>

Section 21(d)(3)(A) of the Exchange Act [15 U.S.C. § 78u(d)(3)(A)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] give the SEC authority to seek civil penalties against violators of the securities laws. Courts can impose penalties in civil injunctive actions not to exceed the greater of: (i) the gross pecuniary gain to a defendant as a result of a violation, or (ii) a specified amount per violation, depending on whether the violation falls in the "first-tier," "second-tier" or "third-tier." *See* 15 U.S.C. §77t(d)(2); 15 U.S.C. §78u(d)(3)(B). Here, the

"gross pecuniary gain" by Crews is the $530,000 set forth above.  Accordingly, the SEC respectfully seeks the imposition of a $530,000 civil penalty upon Crews.

## IV.    **CONCLUSION**

For the reasons set forth herein and in the accompanying Motion, the SEC respectfully requests the Court enter a final judgment against Crews imposing the requested remedies.  For the Court's convenience, a proposed final judgment is being filed with the Motion.

Dated: January 24, 2025

Respectfully submitted,

*/s/ Paul Kim*
Paul Kim
Senior Trial Counsel
Georgia Bar No. 418841
kimpau@sec.gov

Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel: (404) 842-7600
Facsimile: (404) 842-7679